UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSH R. SANTINI,

        *Plaintiff,*

v.

KIM FARRIS,
KEITH PAPENDICK,
RICKEY COLEMAN, and
ERIN PARR-MIRZA,

        *Defendants.*

_____/

Case No. 2:21-cv-13045

Jonathan J.C. Grey
United States District Judge

Patricia T. Morris
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON DEFENDANT ERIN PARR-MIRZA'S MOTION FOR SUMMARY JUDGMENT (ECF No. 61)

## I.   RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Erin Parr-Mirza's Motion for Summary Judgment (ECF No. 61). If adopted, the Court would: (1) **DISMISS** Santini's Eighth Amendment claim against Parr-Mirza; (2) **DISMISS** Santini's claims under the Americans with Disabilities Act, *sua sponte* and **WITH PREJUDICE,** as to all Defendants; and (3) **DECLINE** to exercise supplemental jurisdiction over Santini's medical malpractice claims and claims under Article 1 Section 16 of the Michigan Constitution against all Defendants. Thus, if adopted, Defendant Parr-Mirza would be dismissed from this action. This

1

Report and Recommendation does not address Santini's Eighth Amendment claims against the other Defendants.

## II.   **REPORT**

### A.   **Background**

Joseph Santini is a prisoner in the custody of the Michigan Department of Corrections ("MDOC").  (ECF No. 24, PageID.207).  He alleges that various prison officials violated state and federal law by refusing to provide adequate treatment for his severe and chronic abdominal pain.  (*Id.* at PageID.206, 208–14).

In November 2015, Santini caused an automobile collision while driving under the influence of marijuana, killing his two passengers.  (*Id.* at PageID.208, ¶ 9; *see also* ECF No.79-1, PageID.683).[1]  Santini sustained a traumatic brain injury, "multiple" bone fractures, a bruised and collapsed lung, a liver laceration, and a "puncture[d]" lower intestine.  (ECF No. 24, PageID.208, ¶ 9).

After the accident, Santini spent forty days in a hospital where doctors gave him "Percocet" and "a Fentanyl patch," to alleviate his pain.  (*Id.* at PageID.208, ¶ 10).  Physicians kept Santini "sedated" for most of this period, but when he was

---

[1] Because Santini swore the allegations in his amended complaint to be true under penalty of perjury pursuant to 28 U.S.C. § 1746 (2018), the Court "may" consider his allegations (insofar as they are based on personal knowledge and set forth facts admissible in evidence) to determine whether the record contains a genuine dispute of material fact.  *Sutton v. Glennie*, No. 16-10949, 2019 WL 3069889, at *6 (E.D. Mich. June 7, 2019) (citing *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008)), *report & recommendation adopted by Sutton v. Glennie*, 2019 WL 3068175 (E.D. Mich. Jul. 12, 2019); Fed. R. Civ. P. 56(c)(1)(A), (3).

awake, Santini noticed "a big[,] huge hole in" his abdomen.  (ECF No. 79-1, PageID.656; *see also id.* at PageID.665–66, 686; ECF No. 24, PageID.226).

This "hole" continues to be the primary source of Santini's chronic pain. (ECF No. 79-1, PageID.665, 666, 692).  During the healing process, the hole in Santini's abdomen damaged his nerves and filled with "scar tissue" that would "continuously tear."  (*Id.* at PageID.666, 693 (internal quotation marks omitted)). As a result, his abdominal pain is aggravated by movement.  (*Id.* at PageID.666, 674, 688–92).  While lying down, Santini describes his pain as a "[four] or a [five]" on a ten-point scale.  (*Id.* at PageID.688, 691–92).  But when moving, his pain increases to a seven or an eight with over-the-counter medication (such as Excedrin) and a ten without medication.  (*Id.*)

Following his hospitalization, Santini spent most of the next year at a "brain injury rehab[ilitation] center," where he underwent physical and cognitive therapy. (ECF No. 24, PageID.208, ¶ 10; ECF No. 79-1, PageID.657–58).  There, physicians prescribed Santini fentanyl patches, "as needed," for "long term pain" and Percocet, "as needed," for "break-through pain."  (ECF No. 79-1, PageID.661).  Santini also took "muscle relaxers to calm the muscles" in his abdomen.  (*Id.*)  "Medical staff" at the rehabilitation center opined that Santini "would likely require" permanent "pain management."  (ECF No. 24, PageID.208, ¶ 10; *see also* ECF No. 79-1, PageID.666).

In August 2015, officials transported Santini to the Midland County Jail, and by December Santini was convicted and taken into the MDOC's custody. (ECF No. 79-1, PageID.658). After transferring Santini between several different facilities over the next two years, the MDOC housed Santini at the Macomb Correctional Facility in July 2018. (*Id.* at PageID.658–61). Throughout his incarceration, Santini has not received any pain management beyond over the counter "Tylenol, Motrin, and Excedrin." (*Id.* at PageID.665, 668, 671).

At Macomb, Santini met Kim Farris, a physician's assistant. (ECF No. 24, PageID.208, ¶¶ 12–13). At the time, Farris worked for Corizon Health, a private medical provider contracted by the MDOC. (*See id.* at PageID.207, ¶ 4). Santini asked her to provide "pain management," but Farris declined his request, explaining that she was concerned he might "become addicted to" any medication like what he had taken during rehabilitation. (*Id.* at PageID.208, ¶ 12–13; *see also* ECF No. 79-1, PageID.679). Farris also denied Santini's requests for "physical therapy." (ECF No. 79-1, PageID.672). Santini continued to request pain management over the next few years, and during this time he "repeatedly" spoke with Farris about his need for pain management. (ECF No. 24, PageID.208, ¶ 12; 216, 220; ECF No. 61-3, PageID.512; ECF No. 79-1, PageID.669, 67–76). Still, neither Farris nor any other healthcare staff member would provide Santini with his requested treatment. (ECF No. 71-2, PageID.665, 668, 671).

4

In January 2021, Santini "felt" a "tear in his stomach" when he sat up in his bed.  (ECF No. 24, PageID.209, ¶ 17).  Santini met with a nurse that night.  (*Id.* at PageID.4).  After examining Santini, the nurse suggested that Plaintiff get out of bed by "rolling on his side," rather than "sitting up."  (*Id.*)  The nurse gave Santini "a packet of Motrin" and sent him back to his cell.  (*Id.*)

Two months later, Santini was examined by Juliana Martino, a nurse practitioner.  (*Id.* at PageID.209, ¶19).  Based on Plaintiff's reports of "severe stomach pain" and the "physical damage" to his abdomen, Martino agreed that Plaintiff required pain management, but she warned Plaintiff that she would have to "'jump through hoops' to convince her supervisors to approve" her request for pain management.  (*Id.* at PageID.209, ¶¶18–19).  Martino later asked prison officials to allow Plaintiff to take Neurontin "to control [his] constant pain."  (*Id.* at PageID.225).  She also requested that officials provide Santini with protein shakes because his pain prevented him from eating enough food.  (ECF No. 79-1, PageID.669).  According to Santini, physicians in the MDOC cannot write prescriptions for pain medication without approval from two officials in "Lansing"—Doctor Keith Papendick and Doctor Rickey Coleman.  (*Id.* at

5

PageID.681; ECF No. 24, PageID.207, 210, ¶¶ 5, 24).   These doctors, however, denied Martino's requests.   (ECF No. 79-1, PageID.673, 682).[2]

Days after his examination with Martino, Plaintiff spoke with a nurse over the phone about his chronic pain.   (ECF No. 24, PageID.210, ¶ 21).   Although the nurse "agreed that he" required more involved pain management, she told Plaintiff that she could not provide him with pain management because he had just met with Martino. (*Id.*)

Around this time, Santini began to send "multiple" letters to the prison's "Health Unit Manager," Erin Parr-Mirza.   (ECF No. 79-1, PageID.676, 697).   Santini explains that he believed Parr-Mirza could have "sat down" with Farris and persuaded Farris to request pain treatment from Coleman and Papendick.   (*Id.* at PageID.699).    As the Health Unit Manager, Parr-Mirza was responsible for "coordinat[ing] . . . all clinical activities and all support services for the" prison. (ECF No. 61-3, PageID.509, ¶ 3).   She did "not supervise any physician, physician assistant, or nurse practitioners" in her role as the health unit manager, and she had no authority "to require" medical professionals to pursue "any particular" course "of treatment."   (*Id.* at PageID.510, ¶ 6).   In fact, Parr-Mirza was a registered nurse who could not lawfully prescribe medication.   (*Id.* at PageID.509–10, ¶¶ 1, 5).   Despite

---

[2] Santini also states that he requested "physical therapy" and was denied, but he does not specify whether Martino, Farris, Papendick, or Coleman denied his request.   (*Id.* at PageID.672).

6

Santini's attempts to contact Parr-Mirza, she did not "respond to any of" his messages.  (ECF No. 79-1, PageID.653, 662, 682–83; *see also* ECF No. 24, PageID.210–11, ¶ 24; ECF No. 61-3, PageID.510, ¶¶ 7–8).

The MDOC transferred Santini from Macomb to the Parnall Correctional facility in Jackson, Michigan, in April 2022.  (ECF No. 79-1, PageID.661).  There, Santini began to attend appointments with a new physician, Doctor Peter Watson.  Like Martino, Doctor Watson asked Coleman and Papendick to allow Santini to take Neurontin and protein shakes. (*Id.* at PageID.673, 680–81).  He also requested that Santini be allowed to take Ultram, an opioid pain medication.  (*Id.* at PageID.680–81).  Yet Coleman and Papendick denied these requests too.  (*Id.* at PageID.681–82).

Before transferring to Parnall, Santini filed his original complaint in this matter.  His complaint named Martino as the sole defendant alleging (1) violations of his right to be free from cruel and unusual punishment under both the Eighth Amendment and the Michigan Constitution, (2) violations of Title II of the Americans with Disabilities Act ("ADA"), and (3) medical malpractice.  (*See* ECF No. 1, PageID.1, 4–7; *see* ECF No. 14, PageID.179–80 (explaining that what Santini "refers to as a[n] [ordinary] 'negligence' claim, is actually a medical malpractice claim.")).  Santini later amended his complaint to assert these claims against Coleman, Papendick, and Parr-Mirza.  (*See* ECF No. 24, PageID.206, 211–14).

7

Parr-Mirza has now moved for partial summary judgment, asking the Court to (1) dismiss Santini's Eighth Amendment claim against her and (2) decline supplemental jurisdiction over Santini's medical malpractice claim. (ECF No. 61).[3]

## B. Standard of Review

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that would affect "the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 249–50, 255. Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004). The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)). Instead, the

---

[3] Although Parr-Mirza apparently did not intend to move for partial summary judgment (*see, e.g., id.* at PageID.489 (asking the Court to "grant summary judgment and dismiss this case")), her motion does not acknowledge Santini's claims under the ADA or the Michigan Constitution. (*Id.*)

nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

### C.   Analysis

#### 1.   Eighth Amendment

The Eighth Amendment prohibits "cruel and unusual punishment."  U.S. Const. amend. VIII.  This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined." *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  Indeed, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200. Thus, the state has a duty to provide for the prisoner's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200.

An official violates the Eighth Amendment where he or she acts with "'deliberate indifference' to an inmate's 'serious medical needs.'" *Plair v. Holmes*, No. 1:19-cv-815, 2020 WL 8187989, at *5 (W.D. Mich. Dec. 29, 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976)).  To prevail on an Eighth Amendment claim of deliberate indifference to his or her serious medical needs, a

prisoner must prove three elements.  First, the prisoner must have been deprived of a "sufficiently serious" need.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Second, that deprivation must have been caused by the defendant's "act or omission . . . ."  *Id.*; *see also Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022); *Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021).[4]  And third, the Defendant must have known "of and disregard[ed] an excessive risk to [the prisoner's] health or safety."  *Farmer*, 511 U.S. at 837; *see also Rhinehart v. Scutt*, 894 F.3d 721, 737–38 (6th Cir. 2018).  For the following reasons, I suggest that Santini fails to raise a genuine dispute of material fact on each element.

### i.   Whether Santini had a Sufficiently Serious Need for Additional Pain Management

An inmate's need to establish the seriousness of his or her medical need follows from the Eighth Amendment's proscription of "cruel and unusual" punishment.  *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021).  State actors do

---

[4] Apart from the causation element found in the Eighth Amendment itself, 42 U.S.C. § 1983 (2018)—the vehicle through which prisoners may enforce the Eighth Amendment against state officials—imposes its own causation requirement.  Indeed, the statute creates a private right of action against state actors who "subject[]" an individual to "the deprivation of any rights . . . secured by" federal law.  42 U.S.C. § 1983.  Courts have interpreted this language to require a "direct causal link" between the official's conduct and the plaintiff's injury, precluding vicarious liability.  *Hays v. Jefferson Cty.*, 668 F.2d 869, 872 (6th Cir. 1982); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362, 371–72 (1976).

not violate the Amendment merely because they impose "uncomfortable" prison conditions. *Id.* Sometimes, determining whether an inmate has been denied constitutionally required medical care is a simple task. *See Rhinehart*, 894 F.3d at 737. If a physician has opined that a condition requires care, or if the need for care would be obvious to even a layperson, then the prisoner can prove that his or her medical need was "serious." *Id.* In these situations, all an inmate need do to establish that he or she was deprived of a serious medical need is demonstrate that officials provided either cursory treatment or no treatment at all. *Id.*; *see also Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009).

At other times, this issue is more complex. Several medical needs are not obvious to laypeople, including judges, who are ill-equipped to assess an individual's need for medical care. So to enable factfinders to determine whether the medical need is adequately serious, the plaintiff must support his or her claim with medical evidence that establishes the "detrimental effect of the delay in medical treatment." *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted); *see also Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). Often, this requires plaintiffs to introduce "'expert medical testimony . . . showing the medical necessity for' the desired treatment." *Rhinehart*, 894 F.3d at 737–38 (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)).

The same is true where a prisoner has received some care for an ailment but alleges that the care received was inadequate.  *Phillips*, 14 F.4th at 534–35.  Here too, the prisoner must support his or her claim with medical evidence and it may be necessary to provide medical expert testimony.  *Id.*  Cases concerning inadequate care, however, are held to a heightened standard.  Because Courts are understandably hesitant to second-guess medical judgments, a prisoner who challenges the adequacy of his or her care must demonstrate that the treatment he or she received was so inadequate "as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir. 2005) (internal quotation marks omitted).

Santini's claim falls into this final category.  Indeed, he challenges the propriety of his providers' decision to supply over-the-counter pain medication in leu of a long-term narcotics prescription, a partially liquid diet, or Neurontin.  But factfinders are ill-equipped to assess whether these medical judgments were so inadequate that they are "intolerable to fundamental fairness."  *Miller*, 408 F.3d at 819.  A typical layperson cannot determine whether a particular inmate requires Neurontin.  Nor can most factfinders assess whether a partially liquid diet would be an efficacious means of pain management.  And while most factfinders can certainly infer that prescription narcotics would alleviate much of Santini's pain, they are ill-equipped to weigh this benefit against the potentially disastrous effects of long-term

opioid use.  So, to prove that he has an objectively serious medical need for any of these treatments, Santini needs to assist the factfinder with medical evidence.

The only medical evidence Santini might rely on is testimony from Martino, Watson, or the unidentified nurse who agree that he required at least some of these treatments.  But merely identifying "a disagreement among doctors" is not enough. *Rhinehart*, 894 F.3d at 744–45.  Showing that some physicians preferred one course of treatment while others preferred another, "at most raises 'a simple question of whether [the defendants] made the right medical judgment in treating" Santini.  *Id.* at 744 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).  With no additional evidence to explain why he required protein shakes, Neurontin, or narcotics, this dispute between medical professionals falls far short of the quantum of evidence necessary for a factfinder to infer that Santini's treatment was "not just incompetent, but grossly so." *Phillips*, 14 F.4th at 536.  Thus, I suggest that Santini fails to create a genuine dispute of material fact as to whether his medical needs are sufficiently serious to implicate the Eighth Amendment.

### ii. Causation

Nor does Santini create a genuine dispute as to whether Parr-Mirza caused this deprivation.  While Parr-Mirza was a "registered nurse" by training, her duties as the health unit manager were largely administrative.  (ECF No. 61-3, PageID.509, ¶¶ 1, 3).  She did "not supervise any" medical providers, she could not "require"

13

medical professionals to pursue "any particular" course "of treatment," and she could not even prescribe medication. (*Id.* at PageID.510, ¶¶ 5, 6). So even if Parr-Mirza attempted to "sit down" with Farris, Coleman, or Papendick and tried to persuade them to alter their treatment plan, she had no authority to do so. (ECF No. 79-1, PageID.699); *see Martin v. Kazulkina*, No. 12-cv-14286, 2017 WL 971706, at *3 (E.D. Mich. Feb. 21, 2017).

### iii.   Deliberate Indifference

Even if Parr-Mirza had authority to alter Santini's treatment plan and chose not to, Santini still fails to present evidence from which a factfinder could conclude that such a decision would constitute deliberate indifference to his medical needs. To show that a defendant was deliberately indifferent, a plaintiff must prove that the defendant knew "of the facts that show the serious medical need," that he or she "personally conclude[d] that the need existed," and that the defendant then "consciously disregarded" the need. *Phillips*, 14 F.4th at 535. The defendant need not have acted with the specific intent that the prisoner would be harmed—it is enough to show that he or she consciously disregarded a perceived risk. *Burwell v. City of Lansing*, 7 F.4th 456, 465 (6th Cir. 2021). In addition, "'prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted.'" *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 834).

Yet for many of the same reasons that Santini cannot genuinely dispute that his need for additional pain management is sufficiently serious, he cannot prove that Parr-Mirza knew of and consciously disregarded this need. Again, he fails to present any evidence to explain why Parr-Mirza could have inferred that Farris, Coleman, and Papendick's medical decisions placed him at a "substantial risk" of injury. Because Santini fails to raise a genuine dispute of material fact on each element, I recommend that the Court dismiss his Eighth Amendment claim against Parr-Mirza.

### 2.    Americans with Disabilities Act

With Santini's Eighth Amendment claim disposed of, Parr-Mirza asks the Court to decline supplemental jurisdiction over his state-law medical malpractice claim because there are no longer any federal claims against her. (*See* ECF No. 61, PageID.489 & n.1 (suggesting that the Court can "dismiss this case" after entering summary judgment on Santini's Eighth Amendment claim by declining supplemental jurisdiction over Santini's medical malpractice claim)). But Parr-Mirza is mistaken; Santini also lodges a federal claim against her and her codefendants under the ADA. (*See* ECF No. 24, PageID.206, 212, ¶ 33). (*Compare id.* at PageID.212, ¶ 35), *with* 29 U.S.C. § 794(a) (2018).

Although Parr-Mirza does not move for summary judgment on Santini's ADA claim, I suggest that the Court dismiss this claim as to all Defendants on its own accord.  Both because Santini is a prisoner, and because he filed his complaint *in forma pauperis*, the Court must dismiss any claim on which it determines that Santini has failed to state a plausible claim for relief.  28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(a) (2018).

And here, Santini's amended complaint fails to state a plausible claim for relief under the ADA.  In essence, Santini claims that the defendants violated the ADA because their inadequate medical care prevented him from "participat[ing] in any recreational activities . . . ."  (ECF No. 24, PageID.212, ¶ 35).  But the ADA protects individuals from discrimination, not deficient medical care.  *See Centaurs v. Haslam*, No. 14-5348, 2014 WL 12972238, at *1 (6th Cir. Oct. 2, 2014).  So "mere allegations of inadequate medical care do not raise a viable discrimination claim." *Cannon v. Eleby*, 187 F.3d 634 (6th Cir. 1999); *cf. Smith v. Aims*, No. 20-12013, 2023 WL 2297448, at *5 (E.D. Mich. Jan. 24, 2023); *Vandiver v. Corizon, LLC*, No. 16-13926, 2017 WL 6523643, at *4–5 (E.D. Mich. Dec. 21, 2017).  Thus, I recommend that the Court dismiss Santini's ADA claim as to each Defendant.

### 3.    Supplemental Jurisdiction

That leaves Santini's state law claims.  Federal courts have jurisdiction over any state-law claim that forms "part of the same case or controversy" as the claims

within the court's original jurisdiction.  28 U.S.C. § 1367(a) (2018).  Even so, courts *may* decline to exercise supplemental jurisdiction" over a state law claims in four situations: (1) where a "claim raises a novel question of state law," (2) where a state law claim "predominates" over the claims over which the court has original jurisdiction, (3) where "the district court has dismissed all claims over which it has original jurisdiction," and (4) where "there are other compelling reasons" to decline jurisdiction."  *Id.* § 1367(c)(1)–(4) (emphasis added).  Parr-Mirza appears to argue that if the Court dismisses all federal claims against her, then it can (and should) decline jurisdiction over Santini's medical malpractice claim under this third scenario.

But this argument is premature.  Section 1367 allows courts to decline supplemental jurisdiction after dismissing "*all* claims over which it has original jurisdiction."  *Id.* § 1367(c)(3) (emphasis added).  This language "refers to all claims in the case, not just those claims asserted against a particular defendant."  15a Moore's Federal Practice–Civil § 106.66 (Matthew Bender 3d ed. 2023); *see also Hansen v. Bd. of Trs. of Hamilton*, 551 F.3d 599, 608 (7th Cir. 2008); *Prescott v. Indep. Life & Accident Ins. Co.*, 878 F. Supp. 1545, 1552–53 (N.D. Ala. 1995).  So even if "a defendant faces only state claims, the court must exercise its supplemental jurisdiction over those claims as long as" claims over which it has original jurisdiction remain as to other defendants.  Moore, *supra*, § 106.66; *see also* 28

17

U.S.C. § 1367(a) ("[S]upplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").  Because Parr-Mirza's codefendants have not moved for summary judgment on Santini's Eighth Amendment claim, some of his federal claims remain and the Court cannot decline supplemental jurisdiction under § 1367(c)(3) at this time.

Still, the Court should decline supplemental jurisdiction over Santini's medical malpractice claim (as to each defendant) and cruel and unusual punishment claim under Article 1 Section 16 of the Michigan Constitution for two reasons.  First, the medical malpractice claim raises novel and complex questions of Michigan law. Michigan's Appellate Courts have had few occasions to "to evaluate" medical malpractice "in the prison context," where "officials have a unique degree of control over prisoners' access to health care."  *Rhinehart v. Scutt*, No. 11-cv-11254, 2014 WL 5361939, at *9 (E.D. Mich. Oct. 21, 2014).  In a typical medical malpractice case, general practitioners are held to "the recognized standard of acceptable professional practice or care in the community in which [they] practice[] or in a similar community."  Mich. Comp. L. § 600.2912a(1)(a); *see also Bahr v. Harper-Grace Hosps.*, 448 Mich. 135, 138 (1995).  Yet while some nonbinding decisions have suggested that prisons may constitute a "community" in which a physician

practices for purposes of § 600.2912a(1)(a),[5] Michigan has yet to squarely address

whether, or to what extent, incarceration may impact the duty of care owed to

patients.  And aside from the uncertainty regarding the Defendants' duty of care,

other opinions indicate that medical malpractice claims in the prison context are

fraught with novel issues of state law.  *See, e.g.*, *Harbour v. Correctional Med.

Servs., Inc.*, 702 N.W.2d 671 (Mich. Ct. App. May 24, 2005); *Hayes v. Emerick*, 416

N.W.2d 350 (Mich. Ct. App. 1987).  Because this area of Michigan law remains

underdeveloped, comity weighs against the exercise of supplemental jurisdiction.

Second, Parr-Mirza's codefendants have not moved for summary judgment

on Santini's Eighth Amendment claim, and if that claim proceeds to trial, then trying

Santini's Medical Malpractice claims and Michigan Constitutional claims alongside

his deliberate indifference claim may confuse jurors.  *See Rhinehart*, 2014 WL

5361939, at *9 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 727 (1966)).

Because both claims apply distinct standards that turn on similar facts and "often

overlap," jurors may have difficulty "delineating the differences" between both

versions of the cruel and unusual punishment claims and the medical malpractice

claims.  *Id.*  Accordingly, I recommend that the Court decline to exercise

---

[5] *See, e.g.*, *Hartzell v. City of Warren*, No. 252458, 2005 WL 1106360, at *5 (Mich. Ct.
App. May 10, 2005); *Zimmerman v. Coleman*, Nos. 239976, 241494, 2004 WL 225061, at
*3 (Mich. Ct. App. Feb. 5, 2004).

supplemental jurisdiction over Santini's medical malpractice claims and claims under Article 1 Section 16 of the Michigan Constitution against each defendant.[6]

### D. Conclusion

For these reasons, **I RECOMMEND** that the Court **GRANT** Parr-Mirza's Motion for Summary Judgment (ECF No. 61), **DISMISS** Santini's claims under the ADA **WITH PREJUDICE** as to all Defendants, and **DISMISS** Santini's medical malpractice and Article 1 Section 16 claims under the Michigan Constitution **WITHOUT PREJUDICE** as to all Defendants.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human*

---

[6] As noted in the Undersigned's Order entered alongside this Report and Recommendation, adopting this Report would not dismiss all of Santini's claims against Parr-Mirza because her motion for summary judgment overlooks Santini's claim under Article I, § 16 of the Michigan Constitution.  (*See* ECF No. 24, PageID.206, 230).  The Undersigned has granted Parr-Mirza leave to file an additional summary judgment motion on this claim.

*Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 24, 2024               s/ PATRICIA T. MORRIS
                                      Patricia T. Morris
                                      United States Magistrate Judge